191 Ill. App.3d 237 (1989)
547 N.E.2d 604
In re C.P. et al., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Phil Phillips, Respondent-Appellant).
No. 4-89-0089.
Illinois Appellate Court  Fourth District.
Opinion filed November 9, 1989.
*238 Mark S. Morthland, Assistant Public Defender, of Decatur, for appellant.
Lawrence R. Fichter, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.
Order affirmed.
*239 JUSTICE SPITZ delivered the opinion of the court:
Respondent Phil Phillips appeals from an order of the circuit court of Macon County finding him to be an unfit parent and terminating his parental rights to his five minor children, S.P., C.P., T.P., P.P., Jr., and J.P. We affirm for the following reasons.
The record reveals that a petition was filed on December 18, 1980, alleging that S.P., one-year old son of respondent Phil Phillips, was "a neglected minor in that his environment is injurious to his welfare." S.P. was adjudicated a neglected minor by order dated May 18, 1981, and on the same date an order was entered removing S.P. from the custody of his parents. A second petition was filed on December 9, 1985, alleging that respondent's other four children (ages one, two, three, and four years) were in an injurious environment in that these minors' father, the respondent, caused the mother great bodily harm by striking her in the face. The petition further alleged that this violent act created a substantial risk of physical injury to the children because they were present at the time. On March 12, 1986, an order was entered declaring C.P., T.P., P.P., Jr., and J.P. to be abused minors and directing their removal from the custody of their parents.
On February 5, 1987, the mother, Rose Phillips, surrendered her parental rights as to all five of her children and consented to their adoption. On August 24, 1988, a supplemental petition was filed alleging the respondent to be an unfit person "because: he has failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minors from the respondent father." (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)(m).) Another supplemental petition was filed on the same date, for the remaining minor S.P., alleging two counts against the respondent. The first count was the same as the previous petition for the other children. The second count alleged that the respondent was unfit, having failed to make reasonable progress toward the return of the minor to the respondent father since the adjudication of S.P. as a neglected minor.
A consolidated hearing concerning these allegations was held on January 11, 1989. At the hearing, Jo Lee McElrath testified she served as a child welfare specialist with the Illinois Department of Children and Family Services (DCFS). She explained her duties included overseeing placement of the respondent's five children, formulating objectives for respondent that would enable him to regain responsibility for his children and attending administrative case reviews. She also testified she had been working with the Phillips children from 1985 until the time of the hearing. During 1987 and 1988, there was improved parent-child bonding. Her primary concern was the failure of *240 respondent to provide housing for the children. Respondent was living with his parents, and the children could not live there. In July 1988, approval had been given for two of the children to be returned to respondent, but he never obtained a residence in which the children could reside. In the event respondent obtained housing and two children were returned to him, within two or three weeks public aid would begin to assist them financially. At the time, respondent was only receiving $149 per month as township assistance. Even though respondent's visitation with the children was unsupervised, in this witness' estimation these children would be too much of a task for the respondent if he were responsible for them all, because they were too difficult to control. Respondent needed counseling to help him control his temper.
Eleanor J. Bridgeman, a case worker supervisor of the Social Adjustment and Rehabilitation Program at the Youth Advocate Program, testified she worked with the Phillips family from April 1982 until January 1987. During this time she spent 447 3/4 hours on the case. She worked with the family to improve parenting and discipline techniques. Bridgeman disclosed that in addition to her services, two homemakers were dispatched from the preteen program between October of 1984 and the end of December 1986, working a combined total of 644 1/2 hours to assist the Phillips family. Bridgeman personally supervised the office visits, which were scheduled on a weekly basis. From August 1986 to January 1987, respondent did not participate in these visits. During the visits he kept, respondent made a lot of progress in learning how to discipline the children and learning that each child had special needs. However, since he had not participated in these visits for four months at the time the Department terminated the youth advocate service, the witness did not believe respondent was making reasonable progress at the time the service was terminated. Bridgeman or a homemaker also accompanied the family on visits to doctors to make sure she was aware of the doctor's findings.
The State's next witness was psychologist Dan Hocking. He testified he had evaluated and tested the respondent and had recommended that, on the basis of his evaluation, the respondent should be involved in weekly counseling and vocational training. Hocking examined and tested respondent on March 3 and 9, 1987. As a result of these tests, Hocking recommended respondent become involved in an ongoing program of weekly visits with a clinician. Hocking also suggested that the respondent should be monitored to establish that he was not abusing drugs or alcohol, that respondent participate in some type of vocational training, and that any increase in contact with the children or responsibility for the children be done gradually so respondent's capabilities *241 of handling this extra stress could be evaluated. In addition, if respondent attempted to assume responsibility of all the children, constant ongoing supervision and assistance such as a homemaker would be sufficient to allow respondent to be successful. Finally, Hocking recommended having Phillips evaluated by a psychiatrist to determine whether a mild antidepressant medication would be helpful.
Mary Wade Powell, a psychotherapist who practices with her husband William, testified the respondent had been referred to her for counseling by DCFS. Although a weekly schedule of appointments was set up, respondent kept only two appointments with Powell. During her two counseling sessions with the respondent, Powell encouraged the respondent to make an effort to find gainful employment so he could rent living quarters large enough to accommodate at least some of his children. She further testified respondent failed to secure employment because his hair was too long and there was no work. He indicated he could not rent a place to live on the money provided by the township. Powell agreed that the respondent seemed to place greater significance on his hairstyle than his desire to have custody of his children and that he did not attribute his hair length to any religious conviction. Powell attempted to schedule additional appointments but was unable to do so because she and respondent had difficulty making telephone contact with each other.
The State's next witness was Agnes Clem, a licensed foster parent who cared for T.P. and C.P. for the past three years and two years, respectively. According to Clem, when C.P. and T.P. returned from a visit with their father in December of 1987, C.P.'s mouth and nose were swollen, and when she asked T.P. what had happened, T.P. told her that her daddy had hit C.P. in the mouth, "because he wouldn't stop yelling."
Mary Beth Hudson, another licensed foster parent, testified she was presently a foster parent to J.P., currently age seven. On occasion, when J.P. returned from visits with his father, there would be evidence of corporal punishment. On one occasion, J.P. had a black eye from being hit in the head with a toy. On another occasion, J.P. told Hudson respondent struck him with a belt. She observed three welt marks across the lower part of his back and the top of his "butt." On yet another occasion, J.P. told Hudson his father had washed his mouth out with Comet for using profane speech. Hudson also testified that according to J.P. the respondent would sometimes make the children put their noses against a wall and kind of lean forward and bend down, as a form of discipline.
At the conclusion of the State's case in chief, counsel for the respondent *242 moved for a directed finding as to all counts. After hearing arguments by counsel, the motion was denied.
Respondent testified that although he did not have physical custody of his children, he had been allowed unsupervised visitation with his children at the house of Lori Nicholson, his girlfriend. Respondent had sought counseling at the Decatur Mental Health Center in 1984 or 1985. Later he went to Mary Powell and was subsequently referred to William Powell. In addition to seeing Mary Powell on two occasions, respondent has seen William Powell eight times. Phillips disclosed that the counseling sessions with William Powell were not as profitable for him as the sessions previously attended at the Decatur Mental Health Center. However, respondent admitted he had not seen William Powell for the 2 1/2 months prior to the hearing. He testified that as a result of an automobile accident, he incurred a debt on which $1,100 was owed at the time of the hearing. To satisfy this debt, respondent made monthly payments of $120. Periodically, respondent does odd jobs to supplement the $149 monthly township payment. The money he earns from odd jobs is applied to this debt. Phillips stated that if he knew that cutting his hair would secure employment for him, he would cut his hair. He also testified he has never beaten his children with a belt, although he did wash out his son's mouth with a bar of soap for using profane language and he has smacked them on the rear once or twice. Respondent also testified his father is blind and his parents do not want respondent's children living in their home. Respondent's testimony also revealed that he is not interested in any temporary work because he wants full-time work. He has no disabilities, physical or mental, that would prevent his employment at manual labor.
Lori Nicholson testified that since April of 1988 the respondent's visits with his children have been conducted in her home. Originally, the visits were conducted every Saturday, but more recently they have been every other Saturday. The visits last from 10 a.m. until 4 p.m. She stated she has never seen the respondent hit his children. He disciplines them by sitting them on the couch or standing them in the corner. She accompanied respondent when he looked for employment at several places. Nicholson opined that the respondent is capable of caring for all of his children. She stated Phillips' children are no more wild or unruly than other children.
Following the hearing, the court found the allegations had been proved by clear and convincing evidence. The respondent was found unfit within the meaning of section 1(D)(m) of the Illinois Adoption Act (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)(m)) in that he failed to make reasonable efforts to correct the conditions which were the bases for *243 the removal of the minors and he failed to make reasonable progress toward the return of the minors within 12 months of the April 2, 1981, adjudication of neglect. The parental rights of respondent were terminated. DCFS was appointed as guardian of the minors with full power to consent to adoption. In so finding, the court noted that the respondent made little effort to benefit from the counseling sessions required. The court was especially disturbed by respondent's failure to cut his hair so as to make himself more desirable on the job market. The court pointed out that "the department has made every effort it can make in order to reunite this family * * *, but it just hasn't come to be."
 1 In this appeal, respondent contends the trial court erred by basing its judgment upon the financial inability of the respondent to obtain housing for his children. He cites In re Paul (1984), 101 Ill.2d 345, 461 N.E.2d 983, as a basis for this proposition. In Paul the court concluded that a finding of parental unfitness could not be based upon a mother's failure to correct the situation that brought about the child's removal in the first place where the mother could not afford corrective eyeglasses for the child. The Illinois Supreme Court held that poverty standing alone is not an adequate basis for terminating parental rights. However, in Paul the only basis for terminating parental rights discussed was the failure of the parent to correct the condition which was the basis for the child's removal, whereas in the case at bar there is the additional consideration of whether the respondent has failed to make reasonable progress toward the return of the children.
 2 In In re R.M.B. (1986), 146 Ill. App.3d 523, 496 N.E.2d 1248, this court recognized that a parent with minimum ability might make limited progress toward the return of the child. On the other hand, the courts must not allow the child to live indefinitely with the lack of performance inherent in a foster home. This appears to be the plight of the children in the instant case. For almost eight years the children have been without a permanent home and the security such a home provides.
 3 In In re Boolman (1986), 141 Ill. App.3d 508, 511-12, 491 N.E.2d 1, 3, this court discussed the statutory requirement that a parent must make reasonable progress toward the return of the child within 12 months after an adjudication that the minor was neglected, holding that "reasonable progress" is constituted by "a minimum measurable or demonstrable movement toward that goal." In the case at bar no movement has been discernible over the past seven years and nine months.
 4 The respondent argues that the testimony reveals he is an interested parent since he continued to make regular visits, supervised *244 and unsupervised, with his children. We do not accept that argument. In Boolman, this court noted that, although parents do visit their children, "their refusal to face their shortcomings [is] a sufficient basis for the trial court to conclude that they [have] not made `reasonable progress' toward the return of the child." (Boolman, 141 Ill. App.3d at 512, 491 N.E.2d at 3.) The respondent's visits with his children do not enable him to meet the "reasonable progress" standard when he has failed to make progress in other areas, such as providing housing for his children.
 5, 6 Respondent also argues the State's evidence fell short of the clear and convincing standard and therefore should be reversed. We disagree. While parental rights and responsibilities are matters of deep human importance and will not be lightly terminated, the parental rights of a nonconsenting parent may be terminated if the parent is adjudicated unfit for one or more of the grounds listed in section 1(D) of the Act. (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D); Ill. Rev. Stat. 1985, ch. 37, par. 705-9(3); Paul, 101 Ill.2d 345, 461 N.E.2d 983.) In order for the trial court to find parental unfitness, there must be clear and convincing evidence to support such a finding. (Paul, 101 Ill.2d 345, 461 N.E.2d 943.) However, the question on review is whether the finding of the trial court is against the manifest weight of the evidence. (In re Boolman, 141 Ill. App.3d 508, 491 N.E.2d 1.) It is not the function of the reviewing court to reweigh the evidence or reassess the credibility of the witnesses. (See Gibson v. State Farm Mutual Automobile Insurance Co. (1984), 125 Ill. App.3d 142, 465 N.E.2d 689.) Great deference is given to the findings of the trial court since the judge had the opportunity to view the witnesses and evaluate the testimony. (In re R.M.B., 146 Ill. App.3d 523, 496 N.E.2d 1248.) For the finding to be against the manifest weight of the evidence, the opposite result must be clearly evident from a review of the evidence. Stone v. City of Arcola (1989), 181 Ill. App.3d 513, 536 N.E.2d 1329.
 7 Under the facts of this case, it cannot be said that the trial court's ruling was based upon the respondent's financial shortcomings alone or is against the manifest weight of the evidence. Accordingly, the order of the circuit court of Macon County is affirmed.
Affirmed.
McCULLOUGH, P.J., and STEIGMANN, J., concur.